**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **MAGNOLIA W. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO.    06-2290-Ma/An** |
| | ) | |
| **JO ANNE BARNHART** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## REPORT AND RECOMMENDATION
_____

Before the Court is Plaintiff Magnolia W. Wright's appeal of the denial of a period of disability and disability insurance benefits under Title II of the Social Security Act by Defendant Jo Anne Barnhart, Commissioner of Social Security ("Commissioner").  The appeal was referred to the United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  For the reasons set forth below, it is recommended that the decision of the Commissioner be **AFFIRMED**.

## PROCEDURAL HISTORY

Magnolia W. Wright first applied for Social Security Disability benefits pursuant to Title II of the Social Security Act on September 28, 1994.  Her application was denied on March 14, 1997.  She later filed another application for benefits on April 2, 2002, alleging that she had been unable to work since October 1, 2000, due to diabetes, high blood pressure, shoulder pain, neck pain, swelling, asthma, and fatigue.  Her application was denied both initially and upon

1

reconsideration, whereupon Plaintiff timely filed a request for a hearing.  An administrative

hearing was held on March 18, 2004, before an Administrative Law Judge ("ALJ") who denied

Plaintiff's claim on August 26, 2004.  Plaintiff appealed the decision of the ALJ to the Appeals

Council which declined to review the ALJ's decision on March 14, 2006, leaving the ALJ's

decision as the final decision of the Commissioner of Social Security.  Plaintiff now appeals to

this Court, pursuant to 42 U.S.C. § 405(g).  She argues that the ALJ's decision was not supported

by substantial evidence and that the ALJ applied incorrect legal standards.  Also Plaintiff

contends that remand to the ALJ is appropriate due to the availability of new evidence.

## FACTUAL BACKGROUND

Plaintiff was born on January 17, 1949 and was fifty-five (55) years old at the time of the

hearing before the ALJ.  She has a high school diploma and more than twelve (12) years of work

experience.  Her most recent employment was as a cook at the Memphis City Schools from 1991

until 2001.  While employed with the Memphis City Schools, she was required to walk or stand

for six (6) hours per day; handle, grab or grasp large objects for five (5) hours each day; write,

type, or handle small objects for about one hour each day; and crouch for about one hour each

day.  Plaintiff also performed clean-up after the food was prepared and stocked food in the

school pantry.  She would also frequently lift objects weighing twenty-five (25) pounds or more

and sometimes as much as fifty (50) pounds or more.  TR 123.   Before working for the

Memphis City Schools, Plaintiff was head cook at the Rest Haven Nursing Center, where she

worked from 1989 to 1991.  While employed there, Plaintiff would walk or stand for almost the

entire day, handle, grab or grasp large objects for four (4) hours each day, crouch for one (1)

hour each day, and kneel for one (1) hour each day.  She would also frequently lift objects

weighing twenty-five (25) pounds and sometimes as much as fifty (50) pounds.  TR 124.

Plaintiff alleges that she became disabled in October 2000.  Plaintiff had received treatment from Thomas E. Motley, M.D., from February 1996 through September 2000, for complaints of chest pain; diabetes medication adjustments; hypertension; insomnia; cramping in her hands and feet; urinary frequency and stress incontinence; sinus congestion; and chronic cough and asthma.  TR. 187-204.  Plaintiff also sought treatment at the University of Tennessee Medical Group ("UT"), beginning in August 1998 and continuing through April 2002 for her asthma, recurrent sinusitis, allergic rhinitis, and upper respiratory illnesses.  Brandon Hill, M.D., explained in a letter of September 9, 2003, that Plaintiff "has difficult (sic) to control asthma that often requires oral steroid therapy" and "hospitalizations for exacerbations of her disease."  Dr. Hill opined that Plaintiff's condition was very unpredictable.  TR. 463.  Physicians at UT have also treated Plaintiff for her elevated glucose and GERD.  TR. 251-312.  Plaintiff underwent a panendoscopy at UT Bowld Hospital on November 9, 2001, to evaluate her GERD and reflux symptoms.  James St. Hilaire, M.D., found that Plaintiff exhibited signs consistent with her reflux and also diagnosed a mucosal abnormality.  Tr. 232-235.  In addition, a "Return to Work or School" note, signed by John Janovich, M.D., dated April 13, 1998, states that Mrs. Wright was restricted to light duty work "for an indefinite period of time" due to chronic back pain. TR. 184.

Beginning in October 1997, Plaintiff saw Harold Knight, M.D., at the Memphis Orthopaedic Group for several other problems including a work-related injury to her left middle finger, a scaphoid fracture of her left wrist and a bruised knee following a fall, and subacromial spurring of her left shoulder.  In January 2000, Plaintiff underwent arthroscopic subacromial

decompression-distal clavicle resection on her left shoulder.  TR 242-248.  Dr. Knight noted that the Plaintiff's physical rehabilitation after surgery was slow and restricted her lifting-related work activities until May 2000 when he found that she had tolerated work-hardening and was fit for regular work duty beginning August 24, 2000.  However, on July 18, 2000, Plaintiff presented with more persistent shoulder pain for which Dr. Knight prescribed Vioxx.  Plaintiff returned on August 29, 2000, when Dr. Knight injected her shoulder with Lidocaine and Celestone and prescribed Ultram for pain.  Dr. Knight also gave Plaintiff an impairment rating of 10% (ten percent) for the upper extremity but found her fit for regular duty.  TR. 239.

Plaintiff then began seeing James Shull, M.D., for her continued neck and shoulder pain and underwent MRI testing on January 27, 2001.  The MRI showed evidence of degenerative disc disease with spondylosis,[1] bulging annulus, and central subligamentous disc protrusion at C5-6, C6-7.  TR. 331, 332.  Plaintiff saw Dr. Shull again in April 2002 at which time Dr. Shull prescribed Darvocet.  Furthermore, Plaintiff did not see Dr. Knight again until January 2002 when she returned with more complaints of persistent neck and shoulder pain.  Dr. Knight recommended cervical facet blocks to treat the subligamentous disc protrusion at C5-6 and C6-7.  Plaintiff had the facet blocks in February 2002 but complained that there was no improvement.  TR. 237, 238.

Plaintiff was under the care of Haider Naqvi, M.D., from February 2002 to September 2003, for general care and her diabetes and hypertension.  TR. 465-504.  Dr. Naqvi's office notes are generally illegible, yet the records do note that Plaintiff was diagnosed with osteopenia

---

[1] According to the *Cecil Textbook of Medicine*, spondylosis describes the changes to the bones, vertebrae, joints, and discs of the neck as a result of aging.  Cervical spondylosis is commonly seen in people 55 years of age and older.

subsequent to an x-ray study ordered by Dr. Naqvi in February 2003.[2]  That study also noted that Plaintiff was experiencing generalized demineralization in her lumbar spine and right leg but no "other acute osseous pathology."  TR. 497-498.

Upon Dr. Naqvi's referral, Plaintiff also saw several specialists at this time.  Richard Sievers, M.D., at Mid-South Retina Associates, consulted for an eye examination on November 22, 2002, and again on August 15, 2003.  Dr. Sievers found that Plaintiff had 20/40 vision in her right eye but only 20/300 in the her left eye, which Dr. Sievers could correct to 20/60.  Dr. Sievers opined that this was due to amblyopia and noted that there were no signs of diabetic retinopathy but some indications of mild hypertensive retinopathy.[3]  Dr. Sievers also recommended prescription glasses to Plaintiff to correct the poor vision in her left eye.  TR. 458-460.  Plaintiff also saw Norman T. Soskel, M.D., a pulmonologist, on September 4, 2003, for consultation on Plaintiff's respiratory problems.  Dr. Soskel noted that her asthma was "under good control" and that he was unable to "explain her restrictive disease and diffusing capacity abnormality on the basis of an anatomical abnormality."  TR. 461-62.  Finally, Alan Hammond, M.D., examined Plaintiff on September 18, 2003, for a scalp cyst, a mobile modular mass on her right index finger, and a deep mass in her left buttock.  Dr. Hammond concluded that he could perform surgery to remove the mass on her finger, but Plaintiff chose not to undergo any surgery at that time.  TR. 464.

---

[2] Osteopenia refers to bone mineral density (BMD) that is lower than normal peak BMD but not low enough to be classified as osteoporosis.

[3] Amblyopia is a condition of the eye which usually occurs when one eye is not used enough for the visual system in the brain to develop properly.  The brain ignores the images from the weak eye and uses only those from the stronger eye, which leads to poor vision.

On August 1, 2003, Plaintiff was admitted to Saint Francis Hospital after complaining of chest pains.  Over the course of her stay, Plaintiff received antibiotics and breathing treatments and the chest pains resolved.  Several physicians consulted about the cause of the chest pains. Luis A. Fiallo, M.D., concluded that the pain was most likely the result of costochondritis or musculoskeletal chest pain.[4]

Plaintiff saw Janis Caruso, M.D., of Cypress Family Care and Obstetrics, on October 20, 2003, presenting generalized pain on her right side.  Dr. Caruso noted Plaintiff's other chronic problems: type II diabetes, hypertension, hyperlipidemia, bronchitis, and GERD.  On the follow-up to that initial visit, Plaintiff's generalized pain was intermittent and seemed to be controlled with Aleve.  Dr. Caruso also opined that Plaintiff "does apparently have both some restrictive and obstructive lung disease."  TR. 505-519.  After her second examination of Plaintiff, Dr. Caruso completed a questionaire at the request of Plaintiff's attorney.  Among other things, Dr. Caruso recited Plaintiff's several conditions: type II diabetes, hypertension, hyperlipidemia, bronchitis with components of obstructive and restrictive disease, GERD, musculoskeletal pain, ostopenia, amblyopia, allergic rhinitis, and congestive heart failure.  Dr. Caruso relied on her own observations and testing as well as medical records obtained from Dr. Haqvi, which included Plaintiff's records from the specialists to whom Dr. Haqvi had referred her.  Dr. Caruso noted that Plaintiff's conditions were chronic, "but we can control many of them."  Dr. Caruso

---

[4] Costochondritis is defined in Merriam-Webster's Medical Dictionary as a condition of unknown origin that is characterized by inflammation of costochondral cartilage. -- called also *costochondritis, Tietze's disease.*

opined that Plaintiff could not perform even "light work" due to her shoulder and knee pain.[5]
TR. 507-19.

Plaintiff was also examined by several consulting physicians for Disability Determination
Services ("DDS").  On December 15, 2000, a DDS physician performed a Physical Residual
Functional Capacity Assessment.  The evaluating physician determined that Plaintiff could
occasionally lift and/or carry twenty (20) pounds less than one-third of an eight-hour work day,
frequently lift and/or carry ten (10) pounds for less than two-thirds of the time, stand or walk for
six (6) hours in an eight (8) hour workday, and sit for six (6) hours in an eight (8) hour workday.
TR. 205-212.  On June 21, 2001, Plaintiff saw Douglas Karmel, M.D. for a consultative
examination, and indicated to Dr. Karmel that she experienced shortness of breath, especially
while exerting herself, and when she has asthma attacks.  She also complained of pain in her left
shoulder and problems with her left arm and wrist.  Dr. Karmel opined that Plaintiff could
occasionally lift and/or carry twenty (20) pounds for up to one-third of an eight-hour work day,
frequently lift and/or carry ten (10) pounds for one-third to two-thirds of an eight-hour work day,
stand or walk for six (6) hours in an eight (8) hour workday and sit for six (6) hours in an eight
(8) hour workday.  TR 214-215.  Plaintiff also had a pulmonary function study and chest and
shoulder x-ray studies performed by Barry Siegel, M.D., on July 19, 2001, as part of the DDS
consultive exam.  Dr. Siegel concluded that her pulmonary function was within normal limits

---

[5] The questionaire defined light work as "work involving lifting of no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is in this category when it requires a good deal
of walking or standing, or when it involves sitting most of the time with some pushing or pulling
of arm or leg controls.  To be considered capable of performing a full or wide range of light
work, the patient must have the ability to do substantially all of these activities for a full 8 hour
work day for a five day work week."

and noted no abnormalities in her x-rays.  TR. 216-217.  Denise Bell, M.D., performed a

consultative exam on July 23, 2001, but noted only that she had insufficient data and needed the

pulmonary function study.  TR. 223.  Plaintiff underwent a second Physical Residual Functional

Capacity Assessment on August 2, 2001, performed by Dr. Bell.  Dr. Bell's assessment was the

same as the December 2000 assessment: Plaintiff could occasionally lift and/or carry twenty (20)

pounds less than one-third of an eight-hour work day, frequently lift and/or carry ten (10) pounds

for less than two-thirds of the time, stand or walk for six (6) hours in an eight (8) hour workday,

and sit for six (6) hours in an eight (8) hour workday.  TR. 224-231.  On July 18, 2002, Plaintiff

underwent another consultative exam by a DDS physician, Paul J. Katz, M.D.  Dr. Katz noted

Plaintiff's problems with asthma, hypertension, and diabetes as well as her shoulder surgery.  Dr.

Katz found that Plaintiff suffered from no "specific impairment-related physical limitations."

TR. 333-338.  On August 25, 2002, Denise Bell, M.D., performed another Physical Residual

Functional Capacity Assessment of Plaintiff.  On this occasion, Dr. Bell noted that Plaintiff's

vision for far acuity was limited and that Plaintiff should avoid fumes, odors, dusts, gases, poor

ventilation, etc.  Otherwise, Dr. Bell opined that Plaintiff could occasionally lift and/or carry

fifty (50) pounds less than one-third of an eight-hour work day, frequently lift and/or carry

twenty-five (25) pounds for less than two-thirds of the time, stand or walk for six (6) hours in an

eight (8) hour workday, and sit for six (6) hours in an eight (8) hour workday.  TR. 339-346.

Over the course of her treatment, Plaintiff has been on countless medications for her

asthma, sinusitis, diabetes, GERD, hypertension and periodic pain resulting from her shoulder

surgery and other complaints of pain.  At the time of the hearing before the ALJ, Plaintiff was on

eight different medications: nasonex, ombivent, advair, albuterol, nexium, lipitor, accupril,

glyburide, naproxen, and avandamet.

## **THE HEARING**

At the hearing before the ALJ, Plaintiff testified that her period of disability began after her shoulder surgery.  Plaintiff found that she was no longer able to lift objects at work including large mixing bowls weighing up to four pounds and other food preparation utensils and the food itself weighing more ten pounds.  TR. 31-34.  Plaintiff testified that after more than 20 twenty years working as a cook, she was no longer able to perform these tasks after a fall, which resulted in a broken wrist, and later after her shoulder surgery.  Plaintiff explained that she was no longer able to hold the kitchen objects used in her job and began to drop them on the floor. TR. 34-35.  Plaintiff also recounted her problems with high blood pressure for which she takes medication and experiences some dizziness.  Plaintiff noted her diabetes and high blood sugar counts which she controls with medication, yet she attributes her shortness of breath, fatigue, glaucoma, and swelling around her feet and ankles to her diabetes.  Plaintiff testified that as result of her breathing problems she uses a breathing machine at home to receive breathing treatments every three to six hours.  Plaintiff described her shoulder pains, the recommendation of more surgery, which she does not wish to have, and her treatment by Dr. Caruso.  TR. 35-38. Finally, Plaintiff explained her physical limitations in performing daily tasks around the house and the infrequency with which she leaves the house.  Plaintiff leaves only occasionally to go out for meals with her family or to attend church  TR. 38-40.

## THE ALJ'S DECISION

Using the five-step disability analysis,[6] the ALJ found, at the first step and second step, that Plaintiff had not engaged in any substantial gainful employment since October 1, 2000 and that her asthma, diabetes, obesity, hypertension, and history of left upper extremity pain meet the definition of "severe" under the Social Security Act.  TR 19, 22.

At the third step of the analysis, however, the ALJ found that Plaintiff's impairments did not, singly or in combination, meet or equal a listed impairment as set out in 20 C.F.R. Part 404, Subpart P, Appendix 1.  At the fourth step, the ALJ determined that Plaintiff's impairments allowed her to engage in medium work requiring her to lift/ carry up to fifty (50) pounds occasionally and twenty-five (25) pounds frequently.  She could stand and/or walk for up to six (6) hours in an eight (8) hour work day and could sit for six (6) hours in the same time period. She should not be exposed to concentrated levels of pulmonary irritants. TR 22.  The ALJ thus found that Plaintiff was capable of returning to her past relevant work as a cook.  Accordingly, the ALJ found that Plaintiff was not disabled at any time through the date of his decision.  TR. 25.

_____

[6]Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations.  20 C.F.R. §§ 404.1520, 416.920.  First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months. 20 C.F.R. § 404.1520(c).  Second, the claimant must suffer from a severe impairment.  Id.  Third, the ALJ must determine whether the impairment meets or equals the severity criteria set forth in the Listings of Impairments contained in the Social Security Regulations.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled.  If the claimant's impairment does not meet or equal a listed impairment, the ALJ must then undertake the fourth step and determine whether the claimant has the residual functional capacity to return to any past relevant work.  20 C.F.R. § 404.1520(e).  If the ALJ finds that the claimant cannot perform past relevant work, then the fifth step requires the ALJ to determine whether the claimant can perform other work which exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(f).

## STANDARD OF REVIEW

The standard of review for an appeal of this nature is limited in scope to whether the decision below is supported by substantial evidence and whether the Commissioner used the proper legal standards in making that decision.[7]  Substantial evidence means more than a scintilla of evidence but is less than a preponderance of the evidence.  It is such relevant evidence that a reasonable person might accept as adequate to support a conclusion.[8]  Under the substantial evidence standard, the reviewing court must examine the evidence in the record as a whole and take into account that which detracts from the decision that is under review.[9]  It may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.[10]  If the court finds substantial evidence in the record to support the Commissioner's decision, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way."[11]

## ANALYSIS

### Weight Given to Medical Reports and Records

Plaintiff alleged disability based upon her diabetes, high blood pressure, shoulder pain,

---

[7] 42 U.S.C. § 405(g) (2005); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Abbot v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

[8] *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[9] *Abbott*, 905 F.2d 923 (citing *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).

[10] *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

[11] *Barker*, 40 F.3d at 794 (quoting *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989)).

neck pain, swelling, asthma, and fatigue.  She argues that the ALJ erred in failing to credit the opinion of her primary treating physician, Dr. Caruso, and instead relied upon the opinions of the other physicians and non-treating physicians.  The opinions of treating physicians are generally entitled to greater weight than those of non-examining physicians.[12]  Treating physician opinions, however, receive controlling weight only when they are well-supported by medically acceptable clinical techniques and are consistent with other substantial evidence.[13]  If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion.[14]  Those factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.[15]  Moreover, the ALJ must "give good reasons" in its decision for the weight given to the treating source's opinion.[16]  A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

---

[12] *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985); 20 C.F.R. § 404.1527(d).

[13] 20 C.F.R. § 404.1527(d)(2); *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

[14] *Wilson*, 378 F.3d at 544.

[15] *Id.*

[16] *Id.*

opinion and the reasons for that weight."[17]

Dr. Caruso, one of Plaintiff's treating physicians, opined that Plaintiff could not perform even light work because her "shoulder and knee pain would prevent these activities." TR 509. In the same questionaire, Dr. Caruso noted that the significant objective and clinical findings supporting her diagnosis of Plaintiff were the following: a hemoglobin A1c test indicating that Plaintiff's blood sugar level was 8.1; her blood pressure readings of 148/88 on medication; her low-density lipoprotein (LDL) count of 150 in July 2003; x-ray studies indicating ostopenia; and Plaintiff's eye exam at Mid-South Retina Associates suggesting amblyopia in her left eye.  Dr. Caruso also listed Plaintiff's complaints of pain to include left shoulder pain and inability to lift and Plaintiff's knee pain due to arthritis.  TR. 508.

While the consulting physicians differed among themselves, none agreed with Dr. Caruso's conclusion that Plaintiff could not perform even light work.  Three concluded that Plaintiff could perform light work occasionally lifting and/or carrying twenty (20) pounds less than one-third of an eight-hour work day, frequently lifting and/or carrying ten (10) pounds for less than two-thirds of the time, standing or walking for six (6) hours in an eight (8) hour workday, and sitting for six (6) hours in an eight (8) hour workday.  TR. 205-212, 214-15, 224-231.  One of these physicians in a subsequent assessment, and Plaintiff's most recent assessment, changed her opinion and found that Plaintiff could engage in medium work and occasionally lift and/or carry fifty (50) pounds less than one-third of an eight-hour work day, frequently lift and/or carry twenty-five (25) pounds for less than two-thirds of the time, stand or walk for six (6) hours in an eight (8) hour workday, and sit for six (6) hours in an eight (8) hour workday.

---

[17] *Wilson*, 378 F.3d at 544 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (1996)).

TR. 339-346.  In another examination, the DDS physician found that Plaintiff suffered from no "specific impairment-related physical limitations" at all.[18]  TR. 333-338.

Based on the above, it does not appear that the ALJ improperly rejected the records from Plaintiff's treating physician, Dr. Caruso.  Rather, the ALJ duly noted Plaintiff's full course of treatment with Dr. Caruso and found that Dr. Caruso's opinion that Plaintiff was unable to perform any work was "not entitled to great weight" and is "not supported by the weight of the objective medical evidence."  TR. 23.  The Court notes that unlike the *Washington* case cited by Plaintiff, where the ALJ decided not to give the treating physician's opinion "any weight as evidence," the ALJ here simply stated that Dr. Caruso's "assessment is not entitled to great weight."  TR. 23.  In explaining this conclusion, the ALJ properly cited the fact that Dr. Caruso had seen Plaintiff only twice at the time Dr. Caruso rendered her opinion.[19]  The ALJ also commented that Dr. Caruso's "opinion was without explanation or support from clinical findings, and was not consistent with his (sic) own treatment notations and is inconsistent with the opinions of all the other physicians of record."  TR 23.  It appears that Dr. Caruso had access to the records of another physician treating Plaintiff, Dr. Naqvi, and perhaps up to three specialists: an ophlamologist, pulmonologist, and surgeon.[20]  None of those records seem to

---

[18] This examination was conducted on July 18, 2002.

[19] The Court notes that Plaintiff testified at the hearing that she had continued to see Dr. Caruso since that time.

[20] Dr. Norman T. Soskel, M.D., a pulmonologist, who consulted on Plaintiff's respiratory problems and concluded that her asthma was "under good control."  TR. 461-62.  Dr. Richard Sievers, M.D., of Mid-South Retina Associates, who consulted for an eye examination and opined that Plaintiff's poor visions in her left eye was due to amblyopia and noted that there were no signs of diabetic retinopathy but were signs of mild hypertensive retinopathy. TR. 458-460.  Dr. Alan Hammond, M.D., a surgeon, diagnosed Plaintiff with a scalp cyst, a mobile modular mass on her right index finger, and a deep mass in her left buttock.  TR. 464.

14

support Dr. Caruso's conclusion that Plaintiff was unable to perform even light work due to pain in her knee and shoulder.  Indeed Dr. Caruso's assessment is at odds with the opinions of several other consulting physicians as well as Plaintiff's own testimony about her limitations. Therefore, the Court concludes that the ALJ did not err in failing to credit the opinion of her primary treating physician, Dr. Caruso.

### Residual Functional Capacity Determination

Plaintiff also argues that the ALJ's findings as to her residual functional capacity to engage in medium work activity were unsupported by substantial evidence.  The Court does not agree.  While the consulting physicians disagreed among themselves, the ALJ's findings were not inconsistent with those contained in the examination reports completed by the consulting physicians.  The consulting physicians found, and the ALJ agreed, that Plaintiff was subject to limitations that were not as severe as those suggested by Dr. Caruso.  As discussed above, two consulting physicians concluded that Plaintiff was limited to light work, one physician initially concluded that Plaintiff was limited to light work but later determined in a subsequent assessment that Plaintiff was fit for medium work, and one found no "specific impairment-related physical limitations" at all.  The ALJ also considered findings that showed that Plaintiff's pulmonary function was within normal limits (TR. 216), that her asthma was under good control (TR. 461), and that her diabetes had not presented significant complications (TR. 347).  In determining that Plaintiff's residual functional capacity was restricted to medium work activity, the ALJ considered the consulting physicians' assessments, the Plaintiff's testimony, and the medical evidence in the record.  The ALJ properly weighted Dr. Caruso's findings as to Plaintiff's physical limitations and disabilities because Dr. Caruso's findings were based upon a

15

review of records which did not address Plaintiff's functional capacity and so were not supported by objective clinical data.  The ALJ properly relied upon the residual functional capacity assessment of the consulting physicians.  Further, the ALJ's determination of Plaintiff's residual functional capacity is supported by Plaintiff's own testimony that she performs some household chores, shops with her husband, occasionally goes out for dinner, and sometimes attends church.  Therefore, the Court finds that the ALJ's findings as to Plaintiff's residual functional capacity to engage in medium work activity were supported by substantial evidence.

## Sentence-Six Remand Due to Availability of New, Material Evidence

Plaintiff also argues that the Court should remand her case to the Commissioner pursuant to  42 U.S.C. § 405(g) to consider evidence which arose after the ALJ denied the claim.  This evidence was presented to the Appeals Council who chose to deny Plaintiff's request for review.  TR. 9-12.  Plaintiff argues that remand is warranted because the evidence is new and material and that there is good cause for failure to incorporate the evidence into the record in the prior proceeding.  Plaintiff contends that the evidence is material in so far as it supports Plaintiff's claims of musculoskeletal pain and might have altered the ALJ's decision.  The Commissioner acknowledges that the evidence is new in that it documents Plaintiff's treatment after the ALJ's decision.  However, the Commissioner argues that the new evidence is not material because it does not relate to Plaintiff's condition on or before the date of the ALJ's decision.  The Commissioner states that if Plaintiff believes that her condition seriously deteriorated after the ALJ decision and before the expiration of her insured status, then her only option is to file a new application.

The evidence in question consists of medical records from Plaintiff's treatment at

Methodist Hospital-Germantown in November 2004 and her treatment from Dr. Shankar

Natarjian, M.D., from November 2004 through January 2005.  Plaintiff was admitted at

Methodist Hospital after arriving at the emergency room with pain and numbness on her right

side.  Plaintiff underwent magnetic resonance imaging of the brain, but there were no indications

of a stroke.  She also had magnetic resonance angiography of the brain and neck, which were

"unremarkable."  An MRI of the cervical spine revealed mild congenital narrowing of the

cervical canal (or cervical canal stenosis),[21] central and slightly right paracentral disk protrusion

at C4-C5.  An MRI of the lumbosacral spine showed an anterolisthesis of L4 in relation to L5

and L5 in relation to S1 due to degenerative facets posteriorly.  Among the discharge diagnoses

were listed cervical canal stenosis, cervical disk disease, cervical radiculopathy,[22] and

degenerative disk disease.  The hospital's final report described Plaintiff's "stay as uneventful."

TR. 529.  Additionally, the records of Dr. Natarjian, a neurologist, indicate that Plaintiff

complained of continued pain in her neck and shoulders and numbness and tingling in her arms.

Dr. Natarjian diagnosed Plaintiff with carpal tunnel syndrome and prescribed occupational

therapy as well as Os-Cal and Neurontin.  TR. 677-679.  There were no further notes from Dr.

Natarjian.

     The Court will review post-hearing evidence solely to determine whether a remand is

---

[21] The Merriam-Webster Medical Dictionary defines spinal stenosis as a "narrowing of the lumbar spinal column that produces pressure on the nerve roots resulting in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age."

[22] The term radiculopathy specifically describes pain, and other symptoms like numbness, tingling, and weakness in the arms or legs that are caused by a problem with nerve roots.  This disease is often caused by direct pressure from a herniated disc or degenerative changes in the lumbar spine that cause irritation and inflammation of the nerve roots.

warranted under sentence six of 42 U.S.C. § 405(g).[23]  The test for a "sentence-six remand" is threefold: the evidence must be both (1) new and (2) material, and (3) the claimant must demonstrate good cause for her failure "to incorporate such evidence into the record in a prior proceeding."[24]  The party seeking a remand bears the burden of showing that these requirements are met.[25]  As for the first two prongs of the test, "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding."[26]  Evidence deemed new will also be deemed material only if "there is a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence."[27]  Finally, a claimant may show good cause for the failure to include the new evidence in the record "by demonstrating a reasonable justification."[28]

 Initially, the Court observes that Plaintiff seeks remand because her subsequent treatment "provides further objective evidence supporting Mrs. Wright's subjective complaints of pain and numbness."  Nowhere does Plaintiff assert that the new evidence demonstrates a deteriorating condition.  Therefore, the Commissioner's argument that remand is inappropriate where a plaintiff seeks to show a deteriorating condition, while sound, is misplaced in this instance.

 The Court finds that Plaintiff has not met the standards for a sentence-six remand for the

---

[23] *Hensley v. Comm'r of Social Security*, 2007 WL 162997 at * 2 (6th Cir. 2007).

[24] *Id*. (citing  *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir.2006).

[25]  *See Foster v. Halter,* 279 F.3d 348, 357 (6th Cir.2001).

[26] *Hollon*, 447 F.3d at 483-84.

[27] *Id.* at 484.

[28] *Id*. at 485.

consideration of new evidence.  First, the parties agree that the evidence is new.  While the

ALJ's decision was issued August 26, 2004, the new evidence includes records of Plaintiff's

treatment at Methodist Hospital-Germantown from November 2004 and her treatment from

Shankar Natarjian, M.D., from November 2004 through January 2005.  Second, Plaintiff can

show good cause for her failure to include the new evidence in the record because the evidence

did not exist prior to the ALJ's decision in August 2004.  The evidence also contains records for

Plaintiff's subsequent course of treatment, which she seeks to have considered on remand as

"further objective evidence supporting Mrs. Wright's subjective complaints of pain and

numbness."

        However, Plaintiff's argument for remand must fail because she has not shown how these

subsequent records are material to her claim of disability.  More specifically, Plaintiff has not

carried her burden to show that there is a reasonable probability that the Commissioner may have

reached a different decision if presented with this new evidence.  According to Plaintiff the new

evidence would offer objective proof to support Plaintiff's subjective claims of pain and

disability.  However, the Court notes that the ALJ had before him extensive findings about

Plaintiff's overall musculoskeletal condition and the associated pain as well as Plaintiff's

credibility concerning her limitations.  In fact, the ALJ concluded that Plaintiff's history of left

upper extremity pain was "severe" within the meaning of the Regulations but also that she

"exaggerates her physical and mental complications."  Due to the ample evidence already before

the ALJ and his findings concerning Plaintiff's claims, the Court must conclude that it is not

reasonably probable that the new evidence would have altered the Commissioner's decision in

this case.  Therefore, sentence-six remand for reconsideration of this new evidence would be

inappropriate.

## CONCLUSION

The Court finds that substantial evidence exists to support the ALJ's determination that Plaintiff is not disabled.  The ALJ properly weighted the findings of Plaintiff's treating physician and concluded that Plaintiff's retained the residual functional capacity to engage in medium work activity.  Furthermore, Plaintiff has not met her burden to permit remand of the case to the Commissioner for consideration of new evidence.  Therefore, it is recommended that the ALJ's decision be **AFFIRMED**.


## NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS FROM THE DATE OF SERVICE OF THE REPORT.  FAILURE TO FILE THEM WITHIN TEN (10) DAYS OF SERVICE MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES MAGISTRATE JUDGE

Date: March 19, 2007.